FILED

2023 Mar-27  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JOHNNY YARBROUGH,          )
                         )
        Plaintiff,      )
                         )
    vs.                )    Case No.  5:22-cv-00031-HNJ
                         )
COMMISSIONER, SOCIAL SECURITY  )
ADMINISTRATION,       )
                         )
        Defendant.    )

## MEMORANDUM OPINION

Plaintiff Johnny Yarbrough seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability, disability insurance, and supplemental security income benefits. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 15).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."  *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02.  *Id.* at §§ 404.1520(d), 416.920(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity.  20 C.F.R. §§

2

404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* §§

404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . . Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence

4

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Yarbrough, age 52 at the time of the ALJ hearing, protectively filed an application for a period of disability, disability insurance, and supplemental social security benefits on June 1, 2020, alleging disability as of March 27, 2020.  (Tr. 76, 79, 237-50).  The Commissioner denied his claims, and Yarbrough timely filed a request for hearing on December 15, 2020.  (Tr. 80-143, 146-58, 171-72).  An Administrative Law Judge ("ALJ") held a hearing on June 22, 2021.  (Tr. 44-75).  The ALJ issued an opinion on July 12, 2021, denying Yarbrough's claim.  (Tr. 7-33).

Applying the five-step sequential process, the ALJ found at step one that Yarbrough did not engage in substantial gainful activity after March 27, 2020, his alleged disability onset date.  (Tr. 13).  At step two, the ALJ found Yarbrough manifested the severe impairments of Crohn's disease, obstructive sleep apnea (OSA), degenerative disc disease of the spine, and obesity.  (*Id.*)  At step three, the ALJ found that Yarbrough's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17).

Next, the ALJ found that Yarbrough exhibited the residual functional capacity ("RFC") to perform light work, with additional limitations:

[Yarbrough] can lift and carry 20 pounds occasionally, 10 pounds

frequently, stand and walk 6 hours of an 8 hour workday, sit for 6 hours of an 8 hour workday, no climbing ladders, ropes, or scaffolds; able to stoop, kneel, or crouch occasionally; and avoid concentrated exposure to extreme cold, heat, wetness, humidity, and hazardous moving machinery and unprotected heights.

(Tr. 19).

At step four, the ALJ determined Yarbrough retained the ability to perform his past relevant work as a recreation facility manager and temporary agency referral clerk. (Tr. 27). Accordingly, the ALJ determined Yarbrough has not suffered a disability, as defined by the Social Security Act, since March 27, 2020. (Tr. 28).

Johnson timely requested review of the ALJ's decision. (Tr. 233-36). On November 8, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-6). On January 7, 2022, Johnson filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Johnson argues the ALJ failed to consider his diabetes and anxiety as severe impairments, failed to properly evaluate his subjective symptoms and their effect on his ability to work, and failed to consider the opinion of a treating physician. For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.   The ALJ Did Not Err by Declining to Designate Yarbrough's Diabetes and Anxiety as Severe Impairments

Yarbrough argues the ALJ erred by not designating his diabetes and anxiety as severe impairments.  (Doc. 14 at 6).  The court concludes otherwise and finds that substantial evidence in the record supports the ALJ's findings.

Step two of the sequential evaluation process, during which the ALJ considers the medical severity of a claimant's impairments, constitutes a "'threshold inquiry' and 'allows only claims based on the most trivial impairments to be rejected.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264-65 (11th Cir. 2019) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)).

An impairment or combination of impairments manifests as "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including:

(1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)   Capacities for seeing, hearing, and speaking;

(3)   Understanding, carrying out, and remembering simple instructions;

(4)   Use of judgment;

(5)   Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).  Thus, an ALJ should characterize an impairment as non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).

Furthermore, the mere diagnosis of a physical or mental condition does not necessarily connote a disabling impairment, or even a severe impairment, as the functional effect of a claimant's impairments, not the mere existence of the impairments themselves, governs the assessment of an impairment.  *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she has varus leg instability and shoulder separation.  However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard."); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (finding diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

*Diabetes*

The ALJ did not include diabetes among Yarbrough's severe impairments:

As for the claimant's diabetes, GERD, hyperlipidemia, hypertension, and tachycardia, the medical evidence shows that the claimant has followed with endocrinology for his diabetes and high blood pressure and cholesterol levels during the relevant period.  The claimant takes insulin injections and oral medication (currently on Metformin 1000 mg and glipizide 10 mg, both twice daily) for his diabetes along with multiple prescriptions for his elevated cholesterol and GERD. The medical evidence shows the claimant has complained of visual changes with some double vision as well as numbness and tingling and even headaches at times too . . . .   However, while the claimant's blood sugar levels have varied some, on an overall basis they have not been especially abnormal for all times relevant.

In fact, according to treatment records by endocrinologist Malapuram Reddy, MD, the claimant's glucometer readings have shown his average blood glucose have most ranged between 130 and 220.  Further, the claimant's reported blood glucose levels taken in the doctor's office have even been low at 131 and 137 at two follow ups, and his physical examinations have been generally normal throughout . . . . Absent objective support for significant limitations in the ability to function in the medical evidence from any of these conditions, the claimant's diabetes, hyperlipidemia, hypertension, and tachycardia, while medically determinable, cannot be severe impairments herein.

(Tr. 14).   The ALJ also acknowledged Yarbrough's assertions "that his diabetic medications make him sick, which can make him constipated at times or diarrhea at other times, [yet Yarbrough] noted that these symptoms are generally the same symptoms that he also experiences with his Crohn's disease."  (Tr. 13).  Yarbrough claims "[t]he evidence shows [his] diabetes was consistently described as uncontrolled" and "led to neuropathy and associated foot pain." (Doc. 14 at 7).

The court finds that substantial evidence supports the ALJ's finding; the medical evidence does not portray Yarbrough's diabetes -- as purportedly manifested through

neuropathy and associated foot pain -- constituted a severe impairment.  First, the evidence prior to the alleged onset date do not reflect a severe impairment of that nature.

On February 15, 2017, Complete Family Care reported that Yarbrough exhibited no disturbances in his gait.  (Tr. 416).  On March 6, 2017, and May 8, 2017, Yarbrough presented with a normal gait at Roy Sleep Medicine.  (Tr. 379, 387).  On April 18, 2019, Pulmonary & Sleep Associates reported Yarbrough denied suffering diabetes, and he walked with a normal gait.  (Tr. 431).  On September 16, 2019, Yarbrough presented with a blood glucose level of 249 at Complete Family Care.  (Tr. 474).  On September 25, 2019, Samuel Gillespie, M.D., at Complete Family Care diagnosed Yarbrough with type 2 diabetes without complications.  (Tr. 471).

On January 14, 2020, Dr. Gillespie opined Yarbrough manifested uncontrolled diabetes, yet with marked improvement.   (Tr. 466).   Specifically, Yarbrough's hemoglobin A1C lowered from 9.3 to 7.4 and fasting glucose lowered from 300 to 151. (*Id.*).  On January 21, 2020, Dr. Gillespie remarked Yarbrough maintained uncontrolled and uncomplicated diabetes. (Tr. 462).  He further mentioned Yarbrough's hemoglobin A1C and fasting blood sugar had improved.  (*Id.*).  On February 11, 2020, Yarbrough presented with "severe pain in both feet" at Complete Family Care.  (Tr. 452).  Dr. Gillespie believed Yarbrough's neuropathy stems from his back and the mechanics of his feet.  (Tr. 454).  Yarbrough received a referral to a podiatrist and a prescription for prednisone.  (*Id.*).

The records after the onset date do not present a diverging portrayal. On March 16, 2020, although Yarbrough registered uncontrolled diabetes, Dr. Malapuram Reddy noted Yarbrough's 7.4 A1C and average glucometer. (Tr. 616, 618). Dr. Reddy also chronicled Yarbrough sees a podiatrist for his neuropathy complication, and he exhibited soreness in legs. (Tr. 616). Yarbrough received a prescription for Lantus to treat his diabetes. (Tr. 618).

On May 6, 2020, Yarbrough registered uncontrolled and uncomplicated diabetes at Complete Family Care. (Tr. 444). The provider sent copies of Yarbrough's lab results sent to Dr. Reddy. (*Id.*).

On a June 5, 2020, visit at Complete Family Care, Yarbrough registered uncontrolled diabetes with complications. (Tr. 622). Dr. Reddy stated Yarbrough sees a podiatrist for his neuropathy complication, and Yarbrough exhibited soreness in legs. (Tr. 620). Dr. Reddy also remarked Yarbrough demonstrated a "much higher" A1C of 8.8, and he desired the administering of other tests given Yarbrough's "rapid worsening of diabetes." (Tr. 620, 622). Accordingly, Dr. Reddy increased Yarbrough's Lantus dosage and continued him on Metformin. (Tr. 622).

On an August 12, 2020, at Complete Family Care, Yarbrough registered uncontrolled and uncomplicated diabetes, with other diabetic "neuro" complications. (Tr. 660). Dr. Gillespie found Yarbrough's diabetes reflected "some improvement." (*Id.*). On August 17, 2020, Yarbrough registered uncontrolled diabetes with complications. (Tr. 629). Dr. Reddy recorded Yarbrough sees a podiatrist for his

neuropathy complication, and he had soreness in his legs. (Tr. 629). Yarbrough exhibited an A1C of 7.7 and a blood glucose of 131. (*Id.*). Dr. Reddy defined Yarbrough's drop in A1C as a significant improvement, and characterized Yarbrough's blood glucose as average. (Tr. 631). In addition to continuing Yarbrough's Lantus and Metformin prescriptions, Dr. Reddy prescribed Rybelsus. (Tr. 632).

On September 18, 2020, Yarbrough presented at Huntsville Hospital with lower back pain that radiated into his right hip and left leg, yet he denied any walking difficulty. (Tr. 638-39). During a physical exam, Yarbrough exhibited a non-antalgic gait, ambulation without an assistive device, and a full range of motion in his lower extremities without any pain. (Tr. 640).

On a November 10, 2020, at Complete Family Care, Yarbrough manifested a blood glucose level of 163. (Tr. 696). On November 12, 2020, Yarbrough registered uncontrolled and uncomplicated diabetes, along with an elevated A1C, at Complete Family Care. (Tr. 688). Dr. Gillespie noted Yarbrough likely did not comply with his "low glycemic index food diet." (*Id.*). On November 24, 2020, Yarbrough again reported to at Huntsville Hospital radiating lower back pain, but he denied difficulty walking. (Tr. 670). During a physical exam, Yarbrough displayed a non-antalgic gait and ambulated without an assistive device. (Tr. 671). Yarbrough manifested grossly intact sensation and 5/5 muscle strength in his lower extremities. (*Id.*).

On a February 12, 2021, visit to Complete Family Care, Yarbrough recorded a blood glucose level of 133 at. (Tr. 691). On a March 9, 2021, visit at the same facility

Yarbrough registered uncontrolled and uncomplicated diabetes, and a blood glucose level of 118.  (Tr. 680).

On an April 1, 2021, visit to Huntsville Hospital Yarbrough registered "constant pain in the right low[er] back and hip radiation down the lateral right leg to the knee with associated numbness," but he denied difficulty walking.  (Tr. 665-66).  During a physical exam at the facility, Yarbrough displayed a non-antalgic gait and ambulation without an assistive device.  (Tr. 667).  Yarbrough also exhibited grossly intact sensation and 5/5 muscle strength in his lower extremities.  (*Id.*).

On April 6, 2021, Yarbrough presented at Complete Family Care with diabetes with other diabetic "neuro" complications.  (Tr. 675).  Dr. Gillespie opined Yarbrough suffered "severely uncontrolled diabetes" with neuropathies.  (Tr. 675, 677).

On April 13, 2021, Huntsville Hospital's records portray Yarbrough denied difficulty walking, exhibited a non-antalgic gait, ambulated without an assistive device, reflected grossly intact sensation, and demonstrated 5/5 muscle strength in his lower extremities.  (Tr. 702-03).  Yet, Yarbrough still registered uncontrolled diabetes with complications.  (Tr. 708).  Dr. Reddy chronicled Yarbrough sees a podiatrist for his neuropathy complication, and he manifested soreness in legs.  (*Id.*).  Yarbrough exhibited an A1C of 8 and a blood glucose level of 137.  (Tr. 708).  Dr. Reddy characterized Yarbrough's A1C measure as a significant improvement, and he portrayed an average blood glucose level.  (Tr. 710).  Dr. Reddy also noted Yarbrough discontinued taking his Lantus or Rybelsus medications because Yarbrough complained

of various side effects.  (Tr. 708, 710).

On May 6, 2021, Huntsville Hospital reported Yarbrough denied difficulty walking, portrayed a non-antalgic gait, ambulated without an assistive device, heel-to-toe walked normally, and exhibited a full range of motion in his lower extremities without any pain.  (Tr. 713-14).

Thus, given the foregoing medical evidence, substantial evidence supports the ALJ's finding that Yarbrough's diabetes -- as purportedly manifested through neuropathy and associated foot pain -- does not constitute a severe impairment.

*Anxiety*

Yarbrough also faults the ALJ for not including anxiety among his severe impairments.  The ALJ recounted as follows:

> The medical evidence of record indicates that the claimant has medically determinable mental impairments of ADD, generalized anxiety disorder, and major depressive disorder.  On the other hand, whether considered singly and in combination, the medical and other documentary evidence fails to establish that that the claimant has more than minimal limitation in his ability to perform basic mental work activities from the same.  The undersigned's careful review of medical evidence establishes that the claimant has been doing well on his mental health medications Clonazepam with largely normal mental status findings since the alleged onset date . . . .

(Tr. 15).  The ALJ further considered Yarbrough's mental impairments under the "paragraph B" criteria, the four broad functional areas set out in the regulations for evaluating mental disorders:

> The first functional area is understanding, remembering or applying information.  In this area, the claimant has mild limitation. The medical

evidence, including any mental status findings, generally reveals the claimant has no serious deficits in long-term memory, short-term memory, insight, or judgment. The claimant has been able to give a good history of his medical and mental health history to his medical providers at all times relevant herein. In addition, other than lacking a savings account or knowing how to complete money orders, the claimant reported having no problems handling money, which requires at least a moderate level of memory and understanding. He also knows how to perform normal necessary household activities, such as cooking, cleaning, and shopping, which require a basic level of understanding, remembering, and applying information even if he requires physical assistance from family and friends. Finally, the claimant generally did not complain of symptoms related to understanding and remembering to treating practitioners, and his medication treatment appears to generally control his symptoms related to understanding, remembering, and applying information . . . .

The next functional area is interacting with others. In this area, the claimant has mild limitation. The medical evidence routinely documents the claimant as generally interacting normally with all treating or examining practitioners, who largely have found the claimant as pleasant, cooperative, and/or in no acute distress. Treating or examining practitioners have not observed the claimant having serious deficiencies in eye contact, speech, or conversation, and the claimant has no problems going out in public and can even go out alone. The claimant also still drives. Furthermore, the claimant generally did not complain of serious problems with interpersonal interaction to treating or examining practitioners, and he reports socializing with family and friends both in and outside of the home, although he reports isolating himself mostly and going nowhere on a regular basis. In fact, the claimant lives alone in an apartment without evidence of any serious problems with neighbors as well as family and friends . . . .

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. The medical evidence of record shows the claimant generally did not complain to treating or examining practitioners of serious difficulty maintaining concentration, persistence, and pace. The claimant appears to achieve adequate symptom control from his psychotropic medication, as his mental status examinations have not been particularly abnormal for any part of the period in question. The claimant has not demonstrated serious problems reading, writing, or completing simple calculations. Additionally, treating

or examining practitioners have not reported finding the claimant overly distractible or slow.  Furthermore, other than lacking a savings account or knowing how to complete money orders, the claimant again reported having no problems handling money, which requires at least a moderate level of memory and understanding. He also again knows how to perform normal necessary household activities, such as cooking, cleaning, and shopping, which require at least a moderate level of concentration, persistence, or maintaining pace even considering that he at times requires physical assistance from family and friends in completing tasks . . . .

The fourth functional area is adapting or managing oneself.  In this area, the claimant has mild limitation. The medical evidence of record shows the claimant did not usually complain about serious problems with adaptation and managing himself.  Observations of treating or examining practitioners generally have failed to find the claimant having serious deficiencies in hygiene or wearing inappropriate attire.  There is little to no objective support suggesting that the claimant has serious problems being aware of normal hazards and taking appropriate precautions. Likewise, the undersigned also found little to no objective support in the record that he has ongoing mental health problems that interfere with his abilities to make plans or set goals independently . . . .

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are not severe . . . .

(Tr. 15-16).

Yarbrough argues the ALJ "erred when he determined the evidence failed to establish the Plaintiff had more than minimal limitation in his ability to perform basic mental work activities."  (Doc. 14 at 8).

Substantial evidence supports the ALJ's finding on the severity of Yarbrough's anxiety impairment.  Between January 14, 2016 and March 16, 2020, records from Complete Family Care, Roy Sleep Medicine, and Pulmonary & Sleep Associates portray

Yarbrough displayed the ability, desire, motivation, and readiness to learn, and he exhibited no emotional barriers or cognitive limitations (Tr. 449, 452, 457, 460, 463-64, 469, 472, 476, 481, 486, 490, 494, 497, 501, 505, 509, 513, 518, 522, 526, 529, 533, 536, 540, 544, 547, 552, 557, 562, 565, 568, 572, 577, 580, 584, 587, 591, 594, 599, 602); suffered mild to moderate chronic anxiety (Tr. 496, 544, 549, 564, 576, 580, 587, 591); largely reported during his office visits that he did not experience anxiety (Tr. 416-17, 449, 453, 457, 461, 470, 473, 477, 482, 487, 491, 495, 502, 506, 510, 523, 527, 534, 537, 541, 548, 552, 554, 558, 562, 564, 566, 569, 573, 577, 581, 585, 588, 592, 595, 617) except in some instances (Tr. 382, 388, 432, 464, 514, 519, 530, 545, 588, 603); appeared alert, oriented, and cooperative (Tr. 382, 388, 434-35, 577, 617); exhibited normal speech (Tr. 434-35); reflected an appropriate mood and affect (Tr. 417, 435, 450, 511, 524, 542, 559, 570, 574, 578, 596, 617) except once he portrayed an anxious mood and affect (Tr. 589); and received prescriptions for Xanax, Ativan, and Klonopin as treatment (Tr. 466, 474, 483, 488, 507, 516, 520, 531, 538, 546, 549, 554, 564, 582, 589, 593, 596, 605).

On April 2, 2020, Complete Family Care logged that Yarbrough displayed the ability, desire, motivation, and readiness to learn, and no emotional barriers or cognitive limitations. (Tr. 446). On May 6, 2020, Complete Family Care chronicled Yarbrough complained of experiencing anxiety and continued him on his Klonopin prescription. (Tr. 443-44). Yarbrough also displayed the ability, desire, motivation, and readiness to learn, and no emotional barriers or cognitive limitations. (Tr. 442). On June 3, 2020,

Complete Family care recorded Yarbrough displayed the ability, desire, motivation, and readiness to learn, and no emotional barriers or cognitive limitations. (Tr. 440). On June 5, 2020, Huntsville Hospital reported Yarbrough did not complain of any psychiatric issues, appeared cooperative, and reflected an appropriate mood and affect. (Tr. 621).

On August 12, 2020, Complete Family Care noted Yarbrough suffers from chronic anxiety, but he did not complain about experiencing anxiety during that visit. (Tr. 659-60). Furthermore, Complete Family Care deemed Yarbrough's anxiety in remission. (Tr. 660).

On August 17, 2020, Huntsville Hospital documented Yarbrough did not complain of any psychiatric issues, appeared cooperative, and displayed an appropriate mood and affect. (Tr. 631). On September 18, 2020, Huntsville Hospital reported Yarbrough denied any psychiatric illness, appeared alert and oriented, and exhibited a normal mood and affect. (Tr. 639-40).

On a November 12, 2020, visit to Complete Family Care, Yarbrough reflected a flat affect and somewhat pressured speech. (Tr. 688). Furthermore, Complete Family Care stated Yarbrough suffered from chronic anxiety and referred him to psychiatry for further evaluation. (Tr. 689).

On November 24, 2020, Huntsville Hospital commented Yarbrough did not complain of any psychiatric issues. (Tr. 670). Likewise, on December 9, 2020, Complete Family Care reported Yarbrough did not complain of experiencing anxiety.

18

(Tr. 684).

On March 9, 2021, Complete Family Care recorded Yarbrough complained about anxiety. (Tr. 679). Furthermore, because Yarbrough's anxiety had worsened, he received permission to increase his dosage of Klonopin. (Tr. 680).

On April 1, 2021, Huntsville Hospital reported Yarbrough did not complain of any psychiatric issues. (Tr. 666). On April 6, 2021, Complete Family Care mentioned Yarbrough complained about anxiety. (Tr. 676). On April 13, 2021, Huntsville Hospital reported Yarbrough did not complain of any psychiatric illness, appeared cooperative, and reflected an appropriate mood and affect. (Tr. 703, 709-10). On May 6, 2021, Huntsville Hospital reported Yarbrough did not complain of any psychiatric illness. (Tr. 713).

On June 2, 2021, Complete Family Care mentioned Yarbrough manifested moderate chronic anxiety, although he did not complain about experiencing anxiety during that visit and he reflected an appropriate mood and affect. (Tr. 726-28). On the same day, Lawrence Medical Center wrote a note requesting an accommodation for Yarbrough to keep an emotional support dog in his home to help treat his anxiety. (Tr. 725-26).

Thus, given the foregoing medical evidence, substantial evidence supports the ALJ's finding that Yarbrough's anxiety does not constitute a severe impairment.

## II.     The ALJ Properly Evaluated Yarbrough's Subjective Pain Symptoms

Yarbrough argues the ALJ erred in assessing his subjective complaints of pain. (Doc. 14 at 9-10).   The court concludes substantial evidence supports the ALJ's evaluation of Yarbrough's subjective pain symptoms.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. [*Wilson* v. *Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021).   A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability."   *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted); *see also Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 752 (11th Cir. 2021).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of subjective symptoms and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016).   An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity;

precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Yarbrough testified he suffers most of his pain in his neck, back, legs, and feet. (Tr. 54). On the date of the hearing, Yarbrough rated his pain an eight and half to nine out of ten. (Tr. 54-55). He suffers back and neck pain from degenerative arthritis, muscle spasms, and multiple bulging discs. (Tr. 50-51, 55). He discussed at the hearing that he could hardly put his right leg on the floor due to the pinched discs in his back. (Tr. 53).

In addition, Yarbrough complained his diabetes is "really bad," and his diabetes medication makes him sick. (Tr. 51). Moreover, Yarbrough testified his diabetes causes neuropathy in his feet. (Tr. 52). Yarbrough claimed he places quilts on the floor of his house because of the soreness he experiences in his feet. (*Id.*).

Yarbrough's Crohn's disease medication causes him to experience either

21

constipation or diarrhea, along with suffering those same symptoms due to the disease. (Tr. 51). He attested to suffering extremely high cholesterol, and his cholesterol medication drains him of energy, hurts his legs to the point he cannot walk, and turns them black in spots. (Tr. 51-52, 54). Yarbrough stated he takes 22 "pain pills, shots" in the morning and night. (Tr. 51).

He asserted he could probably stand for "more or less than 15 minutes at one time," but it would probably hurt. (Tr. 53). Yarbrough also attested he could sit for around 15 minutes and should not lift anything heavier than an iron skillet which he equated to about three pounds. (*Id.*). When asked if he could walk half a block, a block, or two blocks," Yarbrough replied he cannot "do anything like that anymore," and he can take the garbage out a couple days of the week. (Tr. 54). Yarbrough claims he cannot do any yardwork, but he can vacuum and sweep. (Tr. 55-56). He does, however, need assistance with changing his bed sheets. (Tr. 56). Yarbrough testified he lies down about four to six hours a day due to his pain. (*Id.*). He also has problems with his vision. (Tr. 58).

Furthermore, Yarbrough remarked he cannot deal with being around large groups of people anymore as a result of his anxiety. (Tr. 57). He then reported he goes to the store early in the morning or late at night to avoid dealing with people. (*Id.*). Yarbrough does find that his anxiety medication, Klonopin, helps with his anxiety; rather it makes him sleepy. (Tr. 63).

In his Function Report, Yarbrough stated he lives in an apartment on his own.

(Tr. 302).  On an average day, Yarbrough explained he wakes up, eats, and then takes his medication.  (*Id.*).  He claims he experiences pain and blurry vision.  (*Id.*).  Yarbrough goes to the store if needed and pays bills, but he does not engage in any other activities.  (*Id.*).   He stands up and lies down all day, takes more of his medication, then goes to bed.  (*Id.*).  Yarbrough mentioned his medication sickens his stomach.  (*Id.*).

Yarbrough wrote he cannot do anything that he used to do previously.  (Tr. 304).  For example, he stated he loved mowing grass, which he can no longer do.  (*Id.*).  Yarbrough discussed how his back pain, feet pain, and nausea affects his sleep.  (*Id.*).  He contends he can dress himself, but it takes longer than in the past and exhausts him.  (Tr. 304).  Somedays Yarbrough does not bathe because he does not "feel like it."  (*Id.*).  He washes his hair while he bathes and shaves, but not as often as in the past because he does not "feel like it."  (*Id.*).  Yarbrough can feed himself but may need assistance preparing his food.  (*Id.*).  He can also go to the bathroom on his own.  (*Id.*).

Yarbrough claims he occasionally needs reminders to take care of himself.  (Tr. 305).  He also needed reminders to take his medicine until he obtained a weekly medicine planner.  (*Id.*).  Yarbrough prepares his own meals, and in the event he cannot, either his mother brings him meals or he orders delivery.  (*Id.*).  He prepares his own meals daily, usually a sandwich or soup, if his mother does not cook.  (*Id.*).  It takes Yarbrough about 30 minutes to prepare his own meals.  (*Id.*).  However, he can no longer prepare his meals from scratch as he did in the past.  (*Id.*).

Yarbrough asserted his cousin assists him with cleaning and laundry.  (*Id.*).  He

explained he can no longer complete house or yardwork due to his back pain and diabetes. (Tr. 306). Yarbrough claims he cannot stand in one spot for long without experiencing pain. (*Id.*). He further remarked it hurts to bend over so, he experiences pain when he vacuums, mops, sweeps, mows, or edges the lawn. (*Id.*).

Yarbrough ventures outside approximately twice a week to run errands if needed. (*Id.*). He does not feel like getting out of bed much. (*Id.*). When Yarbrough does venture out, he drives a car and can do so alone. (*Id.*). Yarbrough tends to grocery shop in stores once or twice a week for about 20 to 30 minutes. (*Id.*). He also discussed he may not venture out every couple of weeks depending on how he feels. (*Id.*).

Yarbrough can pay bills and count change, but he discussed he does not have a savings account and does not know how to fill out money orders. (*Id.*).

Yarbrough wrote he can no longer participate in gardening because of his back. (Tr. 307). He does not spend time with others and mostly isolated himself due to his condition and personal hygiene. (*Id.*). Outside of running errands, Yarbrough visits his mother on occasion. (*Id.*). He does not need reminding to go places and does not need anyone to accompany him when he does. (*Id.*).

Yarbrough claims his condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and concentrate. (Tr. 308). He specified he could lift eight pounds or less and can walk from room to room. (*Id.*). Yarbrough also explained that if he walks to his vehicle, he needs to rest before driving off. (*Id.*). Yarbrough stated his pain and diabetes affects his abilities. (*Id.*). He cannot

24

pay attention for too long due to his attention deficit disorder.  (*Id.*).  Yarbrough completes activities he undertakes although it may take him a few days to do so.  (*Id.*). He stated he can follow a recipe, but he struggles with some written instructions because he has a learning disability.  (*Id.*).  As for spoken instruction, it takes Yarbrough a few minutes to "grasp what's being said."  (*Id.*).

Yarbrough declared he gets along with others as well as authority figures.  (Tr. 309).  He does not handle stress or changes in his routine well.  (*Id.*).  Lastly, Yarbrough does not use any ambulatory assistive devices or glasses/contact lenses.  (*Id.*).

Yarbrough's mother, Barbara Hill, and cousin, Angie Woosley, also filled out a Third Party Function Report.  (Tr. 286-301).  Their Function Reports largely overlap with Yarbrough's, although with slight differences.  Hill sees Yarbrough about two to three times per week, sometimes none.  (Tr. 286).  According to Hill, she stated Yarbrough can load a dishwasher and fold laundry, which takes him about 30 minutes to complete.  (Tr. 288).  Yarbrough varies week to week on how often he performs these particular chores.  (*Id.*).  Hill mentioned that sometimes Yarbrough needs encouragement and help to complete his chores.  (*Id.*).  She also remarked Yarbrough ventures outside three to four times a week.  (Tr. 289).  Hill explained Yarbrough spends time with friends daily via telephone.  (Tr. 290).

In addition to Yarbrough's list of his affected disabilities, Hill added he manifests issues with his memory, understanding, and following instructions.  (Tr. 291).  She also believes Yarbrough can walk about 50 feet before needing to stop and rest for ten to

15 minutes.  (Tr. 291).  Hill wrote Yarbrough can pay attention for ten minutes and follow written instructions very well.  (*Id.*).  However, Yarbrough does not follow spoken instructions very well.  (*Id.*).

Woosley checks on Yarbrough daily and ventures to his home once a week.  (Tr. 294).  She cooks for him, does his housework and laundry, and takes care of anything else if needed.  (*Id.*).  Woosley claims Yarbrough does not do any housework or chores except load a dishwasher.  (Tr. 296).  She contends Yarbrough ventures outside once a week, twice at most.  (Tr. 297).  Woosley also stated Yarbrough does not spend time with others, but he communicates with a few people.  (Tr. 298).  She claims Yarbrough can walk 20 to 50 feet.  (Tr. 299).

The ALJ found that Yarbrough's "medically determinable impairments can reasonably be expected to produce some, but not all, of the alleged symptoms."  (Tr. 20).  However, the ALJ concluded that Yarbrough's "statements concerning the intensity, persistence and limiting effects" of his impairments were not consistent with the objective medical evidence in the record.  (*Id.*).  Substantial evidence in the record supports the ALJ's findings.

On May 6, 2020, Dr. Gillespie recorded Yarbrough manifested osteoarthritis in his back with bilateral sciatica, and he chronicled that Dr. Murray considered treatment by surgery.  (Tr. 444).  Dr. Gillespie also averred Yarbrough exhibited chronic lower back pain, but he characterized the condition as stable.  (*Id.*).  Similarly, Dr. Gillespie

noted Yarbrough displayed right hip pain, but he also defined that condition as stable. (*Id.*).

On June 5, 2020, Dr. Reddy commented Yarbrough exhibited a normal physical exam, including a normal range of motion and strength in his musculoskeletal system. (Tr. 621).

On August 12, 2020, Dr. Gillespie declared that Yarbrough's osteoarthritis and chronic pain would be treated with Celebrex.  (Tr. 660).  Dr. Gillespie also stated Yarbrough did not complain of low back or hip pain.  (Tr. 661).  On August 17, 2020, Reddy remarked Yarbrough exhibited a normal physical exam, including a normal range of motion and strength in his musculoskeletal system.  (Tr. 631).

On September 18, 2020, Huntsville Hospital recorded Yarbrough manifested sacroiliac joint tenderness, trochanteric bursa tenderness, a positive straight leg raise on his right, and pain with hip rotation.  (Tr. 640).  Otherwise, Yarbrough portrayed a normal posture, non-antalgic gait, ambulation without an assistive device, a normal range of motion in his spine, a normal range of motion in his bilateral upper and lower extremities, no spine tenderness, and a negative straight leg raise on his left.  (*Id.*).  A lumbar x-ray revealed multi-level degenerative disc disease with an anterior bone spur, and a pelvis x-ray displayed no significant abnormality.  (*Id.*).

Huntsville Hospital also reviewed a July 25, 2019, MRI of Yarbrough's spine, which displayed a central bulge at L5-S1 and bulging discs at L4-5 and L3-4.  (*Id.*). Huntsville Hospital diagnosed Yarbrough with low back pain, herniated nucleus

pulposus or degenerative disc disease with radiculopathy in his lumbar, and sacroiliac joint pain. (*Id.*).

On October 1, 2020, Dr. Murray reviewed a September 29, 2020, MRI scan of Yarbrough's lumbar spine, compared it to the MRI conducted on July 25, 2019, and discerned no significant change. (Tr. 644). The 2020 MRI exhibited "[r]ather stable multilevel degenerative changes," and "the concentric protrusion at L3-4 [was] more prominent." (Tr. 645). Accordingly, Dr. Murray stated Yarbrough manifested multilevel degenerative disc disease with some facet hypertrophy and mild lateral stenosis at L3-4. (Tr. 644). He did not see any ailment for which he would recommend surgery. (*Id.*). Dr. Murray concluded Yarbrough sould see a physiatrist for "conservative treatment." (*Id.*).

On September 29, 2020, Yarbrough saw Venkata Kantemini, M.D., for abdominal pain. (Tr. 647). Dr. Kantemini determined Yarbrough reflected a normal physical exam, except Yarbrough's abdomen reflected an abnormal appearance and a tender distended lower quadrant. (Tr. 648). Otherwise, Yarbrough's abdomen appeared normal. (*Id.*). An abdomen ultrasound revealed Yarbrough manifested hepatomegaly and hepatic steatosis. (Tr. 646).

On November 12, 2020, Dr. Gillespie chronicled Yarbrough experienced tenderness to palpation on the lumbosacral spine, but his lumbar osteoarthritis appeared stable. (Tr. 688).

On November 24, 2020, Hayley Campbell, M.D., of Huntsville Hospital discerned Yarbrough exhibited no deformity or asymmetry to the lumbosacral spine or tenderness over the bilateral greater trochanteric bursa, but he exhibited tenderness over the right sacroiliac joints. (Tr. 671). Yarbrough also demonstrated a full range of motion of the lumbosacral (albeit with pain) and bilateral lower extremities. (*Id.*). Yarbrough tested positive for the Patrick's test, but he tested negative for the straight leg raise and facet loading test. (*Id.*). In addition, Yarbrough exhibited normal posture, a non-antalgic gait, ambulation without an assistive device, and a normal physical exam otherwise. (*Id.*). Dr. Campbell scheduled Yarbrough for a right L3-4 epidural steroid injection. (Tr. 672).

On March 9, 2021, Dr. Gillespie reported Yarbrough reflected a normal physical exam. (Tr. 680). In addition, Dr. Gillespie noted Yarbrough's osteoarthritis and sciatica appeared stable, and Yarbrough did not complain of low back or hip pain. (Tr. 681).

On March 9, Plaxco Chiropractic Clinic reported Yarbrough exhibited a decreased range of motion in his cervical and lumbar spine. (Tr. 734, 736). However, the examination of Yarbrough's cervical spine appeared normal otherwise. (Tr. 734). During examination of Yarbrough's lumbar spine, he demonstrated a normal heel raise, pulled his right leg during the toe raise, reflected left leg pain while heel walking, and appeared unstable while toe walking. (Tr. 736).

On April 1, 2021, Dr. Campbell of Huntsville Hospital found Yarbrough reflected no deformity or asymmetry to the lumbosacral spine or tenderness over the

bilateral greater trochanteric bursa, but he exhibited tenderness over the right sacroiliac joints. (Tr. 667). Yarbrough also portrayed a full range of motion of the lumbosacral (albeit with pain) and bilateral lower extremities. (*Id.*). Yarbrough tested positive for the Patrick's test, but he tested negative for the straight leg raise and facet loading test. (*Id.*). In addition, Yarbrough exhibited normal posture, a non-antalgic gait, ambulation without an assistive device, and a normal physical exam otherwise. (*Id.*). Dr. Campbell diagnosed Yarbrough with lumbar radiculopathy, sacroiliitis, spondylosis and radiculopathy in his lumbosacral, and herniated nucleus pulposus or degenerative disc disease with radiculopathy in his cervicothoracic. (Tr. 667-68). Dr. Campbell opined Yarbrough "[was] not quite ready for lumbar spine injective therapy." (Tr. 668).

On April 6, 2021, Dr. Gillespie assessed Yarbrough with a decreased range of motion in his lumbar spine and tenderness to palpation. (Tr. 675). Yarbrough portrayed a largely normal physical exam otherwise. (*Id.*).

On April 8, 2021, an MRI portrayed Yarbrough with multilevel degenerative disc disease most significantly on the left at C3-C4, and also degenerative findings at C5-C6 and C6-C7. (Tr. 705). Dr. Campbell opined Yarbrough displayed multilevel degenerative changes with disc osteophyte complex at C3-4, causing left neural foraminal stenosis. (Tr. 707). Dr. Campbell also noted Yarbrough displayed disc osteophyte at C5-6 causing neural foraminal stenosis. (*Id.*).

On April 13, 2021, Dr. Campbell determined Yarbrough exhibited no deformity or asymmetry to the lumbosacral spine or tenderness over the bilateral greater

trochanteric bursa, but he reflected tenderness over the right sacroiliac joints.  (Tr. 703).

Yarbrough also displayed a full range of motion of the lumbosacral (albeit with pain)

and bilateral lower extremities.  (*Id.*).  Yarbrough tested positive for the Patrick's test,

but he tested negative for the straight leg raise and facet loading test.  (*Id.*).  In addition,

Yarbrough displayed normal posture, a non-antalgic gait, ambulation without an

assistive device, and a normal physical exam otherwise.  (*Id.*).  Dr. Campbell diagnosed

Yarbrough with lumbar radiculopathy, sacroiliitis, spondylosis and radiculopathy in his

lumbosacral, and herniated nucleus pulposus or degenerative disc disease with

radiculopathy in his cervicothoracic.  (Tr. 703-04).  Dr. Campbell continued Yarbrough

on his current medications and told Yarbrough to follow up with Dr. Murray for a

neurosurgical evaluation of his cervical spine.  (Tr. 704).

On April 13, 2021, Dr. Reddy chronicled Yarbrough reflected a normal physical

exam, including a normal range of motion and strength in his musculoskeletal system

with no swelling or tenderness.  (Tr. 709).

On May 6, 2021, Dr. Murray diagnosed Yarbrough with a tender right hip bursa.

(Tr. 713).  However, Yarbrough reflected an otherwise normal, physical exam, including

normal posture, non-antalgic gait, ambulation without an assistive device, normal heel-

to-toe walk, normal range of motion of the spine, full range of motion in lower

extremities without pain, no sacroiliac joint tenderness, no trochanteric bursa

tenderness, a negative Spurling's test, a negative straight leg raising test, no pain with

hip rotation, and normal muscle strength.   (Tr. 714).   Dr. Murray also stated

Yarbrough's cervical and lumbar spine films displayed spondylosis and degenerative changes, but no sign of instability, fracture, or convincing nerve root compression.  (Tr. 714-15).  Yarbrough's pelvis x-rays were "within normal limits."  (*Id.*).

On May 13, 2021, a CT scan of Yarbrough's lumbar exhibited a "subtle broad-based disc protrusion to the right at L3-L4 with disc potentially compromising the neural foramen at the level of the exiting right L2 nerve root."  (Tr. 718).  A CT scan on his cervical spine portrayed "[m]ultilevel degenerative changes most significant on the left at C3-C4 where large osteophyte creates moderate canal and left neural foraminal stenosis at the level of the exiting left C4 nerve root, [which was] stable compared to the recent MRI."  (Tr. 722).  In addition, it displayed "[a]pparent disc/osteophyte change at C5-C6 and C6-C7 as seen on the prior MRI [with] a minimal concentric disc bulge at C4-C5."  (*Id.*).  Yarbrough also underwent a cervical and lumbar myelogram which portrayed degenerative changes in the cervical spine at C3-C4, C4-C5, and C5-C6 and milder degenerative changes at L3-L4.  (Tr. 719).

On June 2, 2021, Complete Family Care assessed Yarbrough with a normal physical exam, including moving all extremities well, no decreased range of movement, and normal ambulation.  (Tr. 728).

Thus, substantial evidence supports the ALJ's evaluation of Yarbrough's subjective complaints of pain.

### III. The ALJ Did Not Err in Disregarding Dr. Gillespie's Opinion Regarding Yarbrough's Suitability for Disability Benefits

Yarbrough argues the "ALJ's decision is devoid of any analysis regarding the[] opinions by the [sic] Dr. Gillespie." (Doc. 14 at 18). In particular, Yarbrough takes issue with the ALJ not addressing Dr. Gillespie's opinion that Yarbrough should seek unemployment because "he is unable to hold gainful employment" or is otherwise disabled. (Tr. 675); *see Dye v. Comm'r of Soc. Sec.*, No. 5:20-CV-459-NPM, 2022 WL 970186, at *5 (M.D. Fla. Mar. 31, 2022) (explaining a treating physician's opinion that a claimant "is 'unable to resume any type of gainful employment,'" reflects another way of stating the claimant is disabled (citing 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i))). Indeed, on February 11, 2020, November 12, 2020, and April 6, 2021, Dr. Gillespie encouraged Yarbrough to seek and apply for disability. (Tr. 454, 686, 675).

On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c). Yarbrough's claims, filed on June 3, 2020, fall under the revised regulations. (Tr. 237-250).

Pursuant to the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical

sources." 20 C.F.R. § 404.1520c(a).  The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.  *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.  20 C.F.R. § 404.1520c(b)(2).  Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.  20 C.F.R. § 404.1520c(c)(3)-(5).  The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.  20 C.F.R. § 404.1520c(c)(3)(v).  The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

of our disability program's policies and evidentiary requirements." 20 C.F.R. §

404.1520c(c)(5).

As relevant here, the new regulations elaborate upon physician opinions

regarding a claimant's suitability for disability relief:

> (c) Evidence that is inherently neither valuable nor persuasive. Paragraphs (c)(1) through (c)(3) apply in claims filed . . . on or after March 27, 2017. Because the evidence listed in paragraphs (c)(1) through (c)(3) of this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c [and § 416.920c]:
>
> > . . .
> > 3) Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:
> >
> > (i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work; . . . .

20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i); *see also Glasby v. Soc. Sec. Admin.,

Comm'r*, No. 21-12093, 2022 WL 1214015, at *2 (11th Cir. Apr. 25, 2022) ("The

regulations also provide that statements on issues reserved to the Commissioner,

including statements that an applicant is or is not disabled or able to work, are inherently

neither valuable nor persuasive to the issue of whether an applicant is disabled, and that

the agency will not provide any analysis about how it considered such evidence in its

determination or decision." (citing § 404.1520b(c)(3)(i))).

As elaborated, an ALJ does not maintain an obligation to provide any analysis or discussion on a physician's statement in the record that a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i); *see also Glasby v. Soc. Sec. Admin., Comm'r*, No. 21-12093, 2022 WL 1214015, at *3 (11th Cir. Apr. 25, 2022) ("[T]he ALJ did not err in applying the new regulations to find that the opinion of Ms. Glasby's treating physician—as to whether Ms. Glasby was disabled—was an issue reserved to the Commissioner.").  Thus, the ALJ did not err by disregarding Dr. Gillespie's opinion Yarbrough could not "hold gainful employment."  (Tr. 675).

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 27th day of March, 2023.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE